IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NANA-AKUA TAKYIWAA SHALOM          :

                                   :

     v.                            :   Civil Action No. DKC 11-1382

                                   :

PAYLESS SHOESOURCE WORLDWIDE,      :
INC., et al.                       :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this employment discrimination action is what the court construes as a motion for reconsideration filed by Plaintiff Nana-Akua Takyiwaa Shalom (ECF No. 45) and a partial motion for summary judgment filed by Defendants Payless Shoesource Worldwide, Inc., Richard DeMicco, and Ronald Ebelein (ECF No. 43).[1] The relevant issues have been briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Plaintiff's motion will be denied and Defendants' motion will be granted in part and denied in part.

---

[1] Although purportedly addressing all of the claims contained in the complaint, Defendants have not addressed Plaintiff's claim that she was compensated at a lower rate than comparable white males. (*See* ECF No. 2 ¶¶ 31, 40). Thus, they are not entitled to summary judgment on Plaintiff's disparate pay claim against Payless.

## I.   Background

### A.   Factual Background

Unless otherwise noted, the following facts are either undisputed or uncontroverted.[2]  On November 5, 2006, Plaintiff

---

[2] Plaintiff failed to present any evidence in opposition to Defendants' motion for summary judgment, arguing instead that because of "Defendants' bad faith conduct" and "gross violations" during the course of discovery, she "has been deprived of her right to Defendants' information which will, most likely[,] support all of her allegations." (ECF No. 45, at 2).  While her complaint is purportedly verified, it is not in proper form, as it is neither sworn to – the complaint recites only that Plaintiff "personally appeared before" a notary, not that she swore to the truth of its allegations – nor affirmed under penalty of perjury – Plaintiff asserts only that "the facts herein are true and correct to the best of my knowledge and belief."  (ECF No. 2, at 15).  *See United States v. 8 Gilcrease Lane*, 587 F.Supp.2d 133, 139 (D.D.C. 2008) ("[28 U.S.C.] § 1746 states that a statement of verification [] must be in 'substantially' the same form as the statement set forth in § 1746(2)," and "there are two statements that are essential[:] . . . (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury").  Defendants' motion presents similar evidentiary concerns, however, insofar as some of the exhibits submitted in support (ECF No. 43-2) are not accompanied by an authenticating affidavit or declaration.

Until recently, these oversights may have precluded consideration of any of the purported evidence at this stage. *See, e.g., Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").  The 2010 amendments to Fed.R.Civ.P. 56(c)(2), however, "'eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated.'"  *Brown v. Siemens Healthcare Diagnostics, Inc.*, No. 11-0769, 2012 WL 3136457, at *6 (D.Md. July 31, 2012) (quoting *Akers v. Beal Bank*, 845 F.Supp.2d 238, 243 (D.D.C. 2012)).  Instead of "a clear, bright-line rule ('all documents must be authenticated')," Rule 56(c)(2) now prescribes a "multistep process by which a proponent may submit evidence, subject to objection by the

Nana-Akua Takyiwaa Shalom, an African-American woman born in Ghana, was hired by Defendant Payless Shoesource Worldwide, Inc. ("Payless"), to work as a store associate at a Payless location in Bowie, Maryland.  At the time of her hiring, Plaintiff was provided an employee handbook, which contained the company's equal employment opportunity, sexual and unlawful harassment, and workplace violence prevention policies.  (ECF No. 43-2, at 3-7).[3]  She was also given a pamphlet advising of Payless' "AlertLine," a confidential hotline through which employees were encouraged to report any incident of sexual harassment or similar misconduct occurring in the workplace.  (*Id*. at 26-27). Plaintiff signed an acknowledgement form indicating that she had read the handbook and pamphlet and understood that she was

---

opponent and an opportunity for the proponent to either authenticate the document or propose a method for doing so at trial." *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 10-cv-1144, 2011 WL 5169384, at *2 (W.D.Mich. Oct. 31, 2011). Importantly, "the objection [now] contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Ridgell v. Astrue*, No. DKC 10-3280, 2012 WL 707008, at *9 (D.Md. Mar. 2, 2012) (quoting *Foreword Magazine*, 2011 WL 5169284, at *2).

Here, neither party has objected that the materials contained in the record are not capable of being submitted in admissible form.  Thus, the court will exercise its discretion to consider these documents as being what they are purported to be.

[3] Because Defendants filed their exhibits together under a single docket entry, page references within that entry are to those designated by the court's electronic case filing system.

"responsible for becoming familiar with [the] content" of these documents. (*Id.* at 29).

Throughout the course of her employment, Plaintiff consistently received strong evaluations and earned a number of performance-based awards. (ECF No. 2 ¶¶ 11, 32). In or around February 2007 – just a few months after she was hired – she was promoted to the position of store manager at the Bowie location. Plaintiff's "essential functions" in that capacity included hiring and training employees, conducting performance evaluations, and "develop[ing] a weekly work schedule for Store Associates based on sales forecasts and other business demands." (ECF No. 43-2, at 31-32). Payless' workweek guidelines provided that store managers were expected to "work a five day work week and average 45 hours per week," and that "[i]t may be necessary for [them] to work beyond the 45 hour per week guidelines in cases of holidays or peak periods." (*Id.* at 34). Plaintiff was provided a copy of the store manager handbook, which again included Payless' workplace violence prevention and non-discrimination and harassment policies – referencing the AlertLine service – and set forth the company's "Code of Conduct." (*Id.* at 3-7). The Code of Conduct provided, *inter alia*:

> In an effort to maintain a productive work
> environment, the following acts of
> misconduct are considered serious violations

4

of Company policy and may result in
immediate termination without prior
disciplinary warning: . . .

* Insubordinate behavior, including refusal
or failure to perform job assignments. . . .

* Threatening, coercing, disorderly conduct,
fighting, or use of foul, profane or abusive
language towards Customers, Associates or
Managers.

(*Id.* at 6-7).

Following her promotion, Plaintiff's immediate supervisor
was district manager Defendant Richard DeMicco.  On at least two
occasions in early 2009, DeMicco caused Plaintiff to feel
embarrassed when he mimicked her accent.  On or about January
27, 2009, as DeMicco called roll at a meeting, Plaintiff
answered "present sir," and DeMicco "attempted to imitate [her]
accent and stated 'why don't you just answer 'here' or 'good
morning?'"  (ECF No. 2 ¶ 35).  Approximately one week later, as
DeMicco took some supplies from Plaintiff's store, Plaintiff
"said something about him taking too many of our light bulbs,"
and DeMicco "imitated what Plaintiff said" and said, "I don't
like your accent."  (*Id.*).[4]

Plaintiff also had a number of uncomfortable interactions
with Defendant Ronald Ebelein, a Payless field auditor who

_____

[4] DeMicco denies having ever made "any statement or comment,
negative or otherwise, regarding Ms. Shalom's accent."  (ECF No.
43-2, at 12; *see also id*. at 65).

visited Plaintiff's store on a monthly basis to take inventory.
She asserts:

> Ebelein constantly made sexual comments about [her] body. He occasionally asked if she was wearing Victoria's Secret underwear. He often made comments about male genitalia[,] including comments about the relationship between shoe size and penis size. He often talked about sexual activities and various positions for engaging in sex. On one occasion he asked Plaintiff to watch a pornographic video on his cell phone[,] which included an overweight woman engaging in sex.

(*Id.* at ¶ 33).[5]   Although this conduct made her "extremely uncomfortable," Plaintiff felt that she was "unable to seek relief from DeMicco or [Payless Director of Retail Operations Kathy Rhule] because if either one of them mentioned Plaintiff's discomfort or feelings of harassment, [Ebelein] could easily exact revenge . . . by distorting his reports about the inventory shrinkage at [Plaintiff's] store." (*Id.* at ¶ 34).

On or about February 18, 2009, Plaintiff was involved in an automobile accident in which she "sustained several painful yet unapparent injuries to . . . her neck and back." (*Id.* at ¶ 13). At a meeting the following day, she advised DeMicco that she was

---

[5] Ebelein submitted an affidavit in support of Defendants' motion for summary judgment in which he did not deny that this conduct occurred. (ECF No. 43-2, at 14-15). The affidavit further recites that Ebelein did not "manage any employees or have the authority to hire or terminate employees at [Payless]." (*Id.* at 14).

experiencing "severe back and neck pain resulting from the automobile collision" and that "the numerous pills she was taking" provided no relief. (*Id.* at ¶ 15). DeMicco encouraged her to continue working, stating that "he needed her to be around when Kathy [Rhule] visited the [d]istrict." (*Id.*). Plaintiff saw a physician, but was initially unable to "secure documentation describing the treatment she received." (*Id.* at ¶ 14). She was later referred to a physical therapist, however, who provided "documentation recommend[ing] that she not work more than 45 hours per week during her recuperation." (*Id.; see also* ECF No. 43-2 at 50, 54).[6]

On or about March 10, 2009, "Plaintiff and all other Store Managers in her Region . . . were told by Kathy Rhule . . . that during the weeks of March 29 to April 11 they would have to work 54 hours per week" due to the Easter holiday. (ECF No. 2 ¶ 16; *see also* ECF No. 43-2, at 36). Plaintiff "understood that there was a requirement that during holiday periods [] managers would need to work beyond the 45 hour per week guidelines" and she had regularly worked increased hours during past holidays. (ECF No. 43-2, at 95-96).

---

[6] The record reflects that Plaintiff was referred to a physical therapist on or about March 18, 2009 (ECF No. 43-2, at 50), and that the therapist provided a written recommendation that she not work more than 45 hours per week on March 31 (*id.* at 54).

On March 25, Plaintiff "was experiencing severe back and neck pain" at work and called DeMicco, leaving a "detailed voice-mail message that . . . [she] was planning to work only 45 hours [that] week . . . [and] 50 hours the following week." (ECF No. 2 ¶ 18). On the same date, DeMicco received "a weekly employee schedule" for Plaintiff's store reflecting that Plaintiff "had scheduled herself to work only a 5 day/45 hour per week schedule for the period from March 29 – April 4, which was not in compliance with Ms. Rhule's directive." (ECF No. 43-2, at 9-10).

Plaintiff was unable to reach DeMicco until March 27, at which time DeMicco told her "to take 2 weeks [l]eave of [a]bsence." (ECF No. 2 ¶ 20). Plaintiff voiced concern that the leave of absence was part of a "plan to remove her from the store so [DeMicco] could bring in another Store Manager such as 'Kevin' or 'Stephanie,'" to which DeMicco replied, "I am the District Manager and can do whatever . . . I want[.]" (*Id.*). Plaintiff told DeMicco that although she was still struggling with back and neck pain, "she would gladly work over the 45 hours to which she was restricted." (*Id.*).[7]   After this

---

[7] DeMicco asserts in his declaration that he "notified Ms. Shalom that [her] schedule did not comply with Payless' scheduling directive, [and] she never prepared a corrected one." (ECF No. 43-2, at 10). Rather, "[s]he refused, stating she would provide a doctor's note with hours restrictions, and would be contacting the Human Resources Department." (*Id.*). While

encounter, Plaintiff called Curtis Snell, a human resources manager, and advised him of her injury, of the work restriction recommended by her physical therapist, and that "her doctor was unavailable" to provide documentation. (*Id.* at ¶ 21).[8]

---

Plaintiff's complaint recites that DeMicco insisted that she take a leave of absence, there appears to be no dispute that she did not.

[8] Snell's declaration sets forth a somewhat different version of this discussion:

> On March 27, 2009, [Plaintiff] telephoned me regarding Payless' scheduling policy for Store Managers. Ms. Shalom did not raise any complaints to me regarding her supervisor, Richard DeMicco, but did raise objections to Payless' policy requiring managers to work six days, 54 hours per week prior to holidays and during peak periods (the "6/54 Policy"). Ms. Shalom informed me that she had been involved in a motor vehicle accident on February 18, 2009, and been excused from work for medical reasons from February 19 – March 2, 2009. Ms. Shalom told me she did not want to work the two Sundays mandated under the 6/54 Policy, questioned me about Payless' need for the policy and stated she could provide a doctor's note with restrictions on working more than 45 hours per week during this period.

> . . . In response, I explained the expectations for store managers in the 6/54 Policy to Ms. Shalom, noting that Company policy allowed management to require additional manager hours during peak periods, such as the Easter holiday. I gave Ms. Shalom my fax number so that she could send me the doctor's note evidencing the restrictions on the number of hours she could work.

On March 28, Plaintiff faxed to Snell documentation from her physical therapist "recommending that she work no more than 45 hours per week during her recuperation." (*Id*. at ¶ 22). Snell received the fax on the same date, noting that it "did not include a doctor's note or medical excuse stating that Ms. Shalom was medically restricted from working more than 45 hours per week from March 29 - April 11, 2009." (ECF No. 43-2, at

_____

(ECF No. 43-2, at 43-44).

The complaint recites that Snell told Plaintiff "she was highly thought of by management and that it was acceptable that she not work the mandated 54 hours due to her medical restriction" (ECF No. 2 ¶ 21), and that he "repeated that the work restriction from a medical therapist was acceptable" during a March 30 phone conversation (*id*. at ¶ 23). In his declaration, Snell denies that he ever told her "she was allowed to work fewer hours than those mandated by Ms. Rhule under the 6/54 Policy for the period from March 29 - April 11, 2009" (ECF No. 43-2, at 45), and, at her deposition, Plaintiff herself testified that "[n]obody told her" that "during holidays or peak periods [she] didn't have to work the additional hours." (*Id*. at 75). Thus, there is an unexplained discrepancy between Plaintiff's purportedly verified complaint and her later deposition testimony. *See Mendez v. Nationwide Prop. And Cas. Ins. Co.*, --- F.Supp.2d ----, 2012 WL 4518987, at *3 (D.Md. Sept. 28, 2012) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.") (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). For purposes of the instant motion, it is deemed established that Plaintiff was not given permission to work the reduced schedule.

44).[9]  "After reviewing her fax, [Snell] discussed [Plaintiff's]
failure to provide a doctor's note with hours restrictions with
DeMicco, and it was determined that Ms. Shalom would receive
progressive discipline in the form of a Final Written Warning in
Lieu of Termination . . . for insubordination based upon her
refusal to comply with the 6/54 Policy."  (*Id*. at 44; *see also*
*id*. at 5).

Regarding the events of March 31, 2009 (and thereafter,
according to Plaintiff), the parties present markedly different
accounts.  Plaintiff asserts:

> On or about March 31, 20[09[10]], Plaintiff was
> at the store in the morning when DeMicco
> entered.  He went directly to the stockroom
> and yelled that Plaintiff was not to come to
> the stockroom.  Thereafter, a customer asked
> Plaintiff for a shoe that Plaintiff knew to
> be in the stockroom.  She went to the
> stockroom and DeMicco yelled at her that he
> had asked her [not to] come to the
> stockroom.  She explained that her intrusion
> was at a customer's request.  Later, he
> announced that she would not immediately
> receive a written warning for not working 54
> hours but that he would "write her up" as he

---

[9] The fax presented by Defendants consists of a police
report of the accident, patient discharge instructions, and a
prescription referring Plaintiff to physical therapy.  (ECF No.
43-2, at 47-50).  According to Defendants, Plaintiff did not
produce the note from her physical therapist until the morning
of March 31.  (*Id*. at 54).

[10] The complaint references this date, among others, as
occurring in 2010 rather than 2009.  This appears to be a
typographical error; there is no real dispute that the relevant
events occurred in 2009.

slammed his material[s] on a nearby table.
Plaintiff again asked if he was planning to
bring Kevin and/or Stephanie in to serve as
Store Manager.  DeMicco replied that he was
the District Manager and could [do] whatever
he wanted.  After placing a telephone call
to Kevin, DeMicco pointed out that the note
from Plaintiff's therapist indicated the
restriction in her work hours was
"recommended" rather than "needed."[11]
Plaintiff told DeMicco she was about to call
[Rhule] concerning his rude behavior.  She
reached into her locker for her purse which
contained her cell phone.  At that point he
grabbed her right hand to prevent her from
reaching her phone.  He then yelled that she
was suspended and should "get out."

. . . After DeMicco notified Plaintiff that
she was suspended[,] he demanded her keys to
the store.  In tears, Plaintiff left the
store and went to her car in the parking
lot.  DeMicco approached her car while she
was seated in it.  He was irate and banged
on the car demanding the keys.  Plaintiff
was afraid and did not open the windows.
DeMicco eventually left, [and] Plaintiff
took the keys to the store's Assistant
Manager in the store and left.

(ECF No. 2 ¶¶ 24, 25).

According to Plaintiff, later on the same date, she placed

several phone calls to Rhule, leaving messages.  (*Id*. at ¶ 26;

*see also* ECF No. 43-2, at 79).  On April 1, Rhule returned her

call and, upon hearing Plaintiff's report of the encounter with

DeMicco the day before, said "she hoped this was not a racial

---

[11] As will be seen, DeMicco asserts that on the morning of
March 31 Plaintiff provided him with a recommendation from her
physical therapist that she not be required to work the 6/54
schedule.  Although Plaintiff omits this detail, this appears to
be a reference to the same recommendation.

case," that "DeMicco could not suspend her if she had a medical explanation from her therapist," and that "she would call DeMicco and call Plaintiff back." (ECF No. 2 ¶ 27). Shortly thereafter, DeMicco called Plaintiff to advise that "they would have a conference call the following day." (*Id*.).

On April 2, Snell called Plaintiff and "pointed out that the therapist's medical note provided that it was a 'recommendation' rather than a requirement," adding "[y]ou thought you could get away with it." (*Id*. at ¶ 28). At approximately 7:06 p.m., Rhule called Plaintiff, advising that "she did not think this was a racial case and she hoped it would not go any further." (*Id*. at ¶ 29). At around 8:00 p.m., during a telephone conversation with DeMicco, Plaintiff's employment with Payless was terminated.[12]

Defendants' version of events is provided through the declaration of DeMicco, portions of which are corroborated by Snell's declaration. DeMicco recalls:

> On March 31, 2009, I traveled to Store 1832
> to meet with Ms. Shalom and to provide
> verbal counseling and the Written Warning.

---

[12] The complaint recites that this phone call took place at 8:00 a.m., rather than 8:00 p.m., but this appears to be a typographical error in light of the conversations Plaintiff allegedly had with Snell and Rhule earlier on the same date. Notably, Defendants' human resources records reflect Plaintiff's discharge date as April 3, 2009, *i.e.*, the next business day after the telephone call between DeMicco and Plaintiff. (ECF No. 43-2, at 18).

Ms. Shalom provided me with a handwritten note, dated March 31, 2009, from her physical therapist, which 'recommended' that [she] 'perform and progress with work activities as tolerated,' but which did not contain any restriction on her hours.[13] Although I attempted to explain that the therapist's recommendation was insufficient and to deliver the Written Warning, Ms. Shalom became hostile, agitated and confrontational, shouting at me and throwing her personal belongings around the backroom. Ms. Shalom also refused to sign or accept a copy of the Written Warning documenting her non-compliance with the scheduling directive.

. . . I informed Ms. Shalom that I was going next door to make a copy of the note from her physical therapist, and then would return it to her.  Ms. Shalom followed me through the sales floor to the store entrance, continuing to shout at me in front of customers and associates, demanding the return of her document.  I informed Ms. Shalom that her further insubordinate and confrontational conduct would be reviewed with management and human resources, and asked that she provide me with the key to Store 1832.  Ms. Shalom refused.

. . . Later on March 31, 2009, I spoke with Mr. Snell by telephone to review Ms. Shalom's conduct and relevant policies, such

---

[13] The note from the physical therapist, dated March 31, reflects that it was faxed to DeMicco at 8:23 a.m., and recites:

Due to [Plaintiff's] injuries following a motor vehicle accident on 2/18/09, it is our recommendation that she . . . progress with work activities as tolerated.  She would benefit from working 45 hrs./wk. vs. 54 hrs./wk. at this time, while recovering from her injuries.

(ECF No. 43-2, at 54).

> as Payless' Code of Conduct.  At that time,
> a determination was made that Ms. Shalom's
> employment with Payless would be terminated
> for cause based upon violation of the
> Company's Code of Conduct, including her
> continued refusal to comply with the store
> manager scheduling policy for holidays and
> her insubordination and hostile attitude
> toward me.

(ECF No. 43-2, at 10-11).  DeMicco denies that he ever "ma[de]

any physical contact with Ms. Shalom, or attempt[ed] to make

physical contact with her, at any time during [the] counseling

meeting on March 31, 2009." (*Id.* at 12).

The "personal counseling form," dated March 31, states:

> Communication was put forth for mandatory 6
> day 54 hour work weeks for weeks 3-29 to 4-4
> and 4-5 to 4-11.  [Plaintiff] stated that
> she would only work 45 hours for that week.
> [DeMicco] reiterated that it was a
> district/region requirement to work and
> schedule the above.  [Plaintiff] blatantly
> only scheduled herself for 45 hours and 2
> days off for both weeks.  [Plaintiff]
> disregarded company direction with her
> insubordination.  As per policy . . .
> [Plaintiff] must schedule and work the
> direction that is given to her.  Any other
> incidents viewed as insubordination will
> result in immediate termination.

(*Id.* at 52).  In the margin just above DeMicco's signature, a

single sentence is added: "[Plaintiff] has been terminated for

insubordination as per Curtis Snell." (*Id.*).  The form further

reflects that Plaintiff refused to sign.

On April 2, 2009 – after Plaintiff's termination, according

to Defendants' version of events – DeMicco received a fax from

the office of Dr. Jae S. Chung, which indicated on the cover sheet:

> Patient [*i.e.*, Plaintiff] has an appointment on April 6 for follow-up with Dr. Chung. Dr. Chung had emergency surgery on Saturday, March 21 [and] has been out of the office. . . . He is returning on April 6.  Please accept this note on behalf of our patient until Dr. Chung fully returns.

(*Id*. at 56).   Attached to the cover sheet was a "disability certificate," signed by Dr. Chung, dated March 18, 2009, which reflected that Plaintiff was "partially incapacitated" from "3/18/09 to 4/5/09" and that she "needs to work only 45 hours due to injury." (*Id*. at 57).

After Plaintiff's termination, Payless promoted Kevin Campbell, a Caucasian male, to serve as manager of the Bowie store.   Defendants acknowledge that Mr. Campbell was assigned to replace Plaintiff as store manager, but deny that this was planned prior to the events of March 31. (*Id*. at 11-12, 44-45).

### B.   Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about October 28, 2009. (ECF No. 43-2, at 59-61).   The cover sheet reflects a charge of retaliation and discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, *et seq*., on the basis of race, sex, and

national origin.   (*Id*. at 59).   As to the particulars, the charge recites:

> I.   I was subjected to unfair treatment and
> negative statements were made regarding my
> accent[;] management was verbally abusive[;]
> and I was forced to work when injured.   My
> managers would not accept my doctor's slip
> and information from my therapist.   I was
> forced to work at lesser wages compared to a
> male[,] but a [w]hite [f]emale was not
> forced to work at lower wages than the
> [w]hite male in the same store.   I was
> replaced by a [w]hite [m]anager.  Management
> stated there were too many [b]lack
> [m]anagers.
>
> II.  In April 2009, this employer discharged
> me for falsification.
>
> III. I believe that I have been
> discriminated and retaliated against in
> violation of Title VII . . . because of my
> involvement in a protected activity under
> the statute, with respect to my gender,
> female, [n]ational [o]rigin, Ghana, race,
> Black[,] and the Equal Pay Act of 1963 with
> respect to wages and discharge.

(*Id*. at 60).   A right-to-sue letter was issued by the EEOC on December 30, 2010, advising Plaintiff of her right to file suit in state or federal court within ninety days.  (*Id*. at 61).

Plaintiff commenced this action in the Circuit Court for Montgomery County, Maryland, on or about March 31, 2011.   Her complaint alleges discrimination and retaliation under Title VII, 42 U.S.C. § 1981, and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code Ann., State Gov't § 20-606, as well as negligent supervision and retention.   Payless removed to

this court on May 23, 2011, asserting federal question and diversity jurisdiction, and, shortly thereafter, answered the complaint.   DeMicco and Ebelein consented to removal and filed answers, and a scheduling order was issued on August 10, 2011.

The schedule was extended on three occasions.   On July 5, 2012, Defendants filed a status report indicating that Plaintiff's counsel had advised that he would be requesting further extension of the discovery deadline and that Defendants opposed that request.   (ECF No. 29).   On the same date, Plaintiff separately filed a motion for extension of time to complete discovery (ECF No. 30) and a motion for sanctions (ECF No. 31).   The motion for sanctions alleged that "Defendant [Ebelein] and [his counsel] materially interfered with and impeded Plaintiff's attorney's deposition of Mr. [Ebelein]," as evidenced by Plaintiff's observation of defense counsel "mov[ing] her chair closer to Mr. [Ebelein]" at one point, "writing something on [a] tablet . . . and then pushing that tablet in front of [Ebelein]," and "jabbing [Ebelein]" beneath the table "during his answers to [Plaintiff's counsel's] questions." (*Id*. at 1).   Plaintiff subsequently filed a motion to suspend the schedule to permit further investigation of the allegations raised in her motion for sanctions concerning a potential "[f]raud on the [c]ourt[,] and efforts she may undertake under Federal Rule of Civil Procedure 60(b), or other

18

civil and/or criminal claims." (ECF No. 32, at 1).[14]
Plaintiff's motions were denied during a recorded, telephonic
motions hearing held August 24, 2012.[15]

On August 27, 2012, Defendants filed the pending motion for
summary judgment. (ECF No. 43). In opposing the motion,
Plaintiff contends that she is "unable at this time to provide
evidence and corresponding argument in further support of her
[c]omplaint . . . because her efforts to glean such evidence
were precluded by Defendants' misconduct throughout the
discovery period allowed in this case." (ECF No. 45, at 1).
More specifically, she reiterates her suggestion that the
aforementioned conduct at Ebelein's deposition constitutes a
"fraud on the court," and argues that "[t]he court erred by

_____

[14] Along with her reply papers, Plaintiff filed an amended
motion that, at least with regard to the factual allegations,
was identical in all material respects to the original motion
for sanctions. (ECF No. 38).

[15] During that hearing, Plaintiff's counsel acknowledged
that, although Ebelein's deposition took place on June 13, he
did not raise the alleged misconduct until approximately three
weeks later; that he had not reviewed the full transcript of the
deposition (rather, he had read only the few pages produced by
Defendants as attachments to their motion papers); that he could
not point to any of Ebelein's testimony that was not full and
candid; that he initially did not believe that any objectionable
conduct had taken place; and that he did not know what he would
do differently if another deposition were ordered. Finding no
grounds for relief, the court denied Plaintiff's motion (and
amended motion) for sanctions and found the motion for a stay of
the schedule was moot. The court also denied Plaintiff's motion
for an extension of time to complete discovery – which, counsel
argued, was necessary in light of power outages following a
storm – finding no good cause for further extension.

summarily  denying  Plaintiff's  motions  for  a  stay  [and]
additional  time  in  which  to  complete  discovery  and  for
sanctions."  (*Id*. at 2).  She further requests that Defendants'
motion for summary judgment be denied due to Defendants' "bad
faith  conduct."  (*Id*.).  Defendants  filed  reply  papers  on
October 1, 2012.  (ECF No. 46).

## II.  **Plaintiff's Motion for Reconsideration**

To the extent that Plaintiff alleges error by the court in
denying her motions for sanctions, for an extension of time to
complete  discovery,  and  to  stay  the  schedule,  her  opposition
papers  may  be  construed  as  a  motion  for  reconsideration.  A
motion  to  reconsider  an  interlocutory  order  is  governed  by
Federal Rule of Civil Procedure 54(b).  That rule provides that
"any  order  or  other  decision,  however  designated,  that
adjudicates  fewer  than  all  the  claims  or  the  rights  and
liabilities of fewer than all the parties . . . may be revised
at any time before the entry of a judgment adjudicating all the
claims  and  all  the  parties'  rights  and  liabilities."  The
precise  standard  governing  such  a  motion  in  the  Fourth  Circuit
is unclear.  *See Fayetteville Investors v. Commercial Builders,*
*Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991).  While the standards
articulated  in  Rules  59(e)  and  60(b)  are  not  binding  in  an
analysis of Rule 54(b) motions, *see Am. Canoe Ass'n v. Murphy*

*Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003), courts frequently look to these standards for guidance:

> Public policy favors an end to litigation and recognizes that efficient operation requires the avoidance of re-arguing questions that have already been decided. Most courts have adhered to a fairly narrow set of grounds on which to reconsider their interlocutory orders and opinions. Courts will reconsider an interlocutory order in the following situations: (1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice.

*Akeva, L.L.C. v. Adidas America, Inc.*, 385 F.Supp.2d 559, 565-66 (M.D.N.C. 2005) (citations omitted); *see also Beyond Sys., Inc. v. Kraft Foods, Inc.*, No. PJM-08-409, 2010 WL 3059344, at *1-2 (D.Md. Aug. 4, 2010) (applying three-part test when evaluating a motion for reconsideration under Rule 54(b)).

Plaintiff has not addressed any of the applicable grounds for reconsideration, nor does any appear to be applicable. Rather, she merely cites a string of cases for the proposition that "[i]n the presence of credible allegations of substantive misconduct by a party and/or its attorney(s), the Fourth Circuit has been very clear that a district court, in the exercise of its discretion and inherent powers, may conduct an investigation, . . . order remedial steps, and, to discourage future misconduct and bad faith actions, may impose sanctions."

(ECF No. 45, at 2).  Be that as it may, Plaintiff has not
identified any "credible allegations of substantive misconduct,"
nor has she demonstrated how the court's prior ruling was in
error.  At base, she simply rehashes the same arguments
considered and rejected by the court during the prior motions
hearing.  *See Sanders v. Prince George's Public School System*,
No. RWT 08cv501, 2011 WL 4443441, at *1 (D.Md. Sept. 21, 2011)
(a motion for reconsideration is "not the proper place to
relitigate a case after the court has ruled against a party, as
mere disagreement with the court's rulings will not support
granting such a request").  Thus, the argument presented by
Plaintiff in opposition to Defendants' motion for summary
judgment, construed as a motion for reconsideration, is
unavailing.[16]

---

[16] Plaintiff's argument may also be construed as a request
pursuant to Fed.R.Civ.P. 56(d), which provides that "[i]f a
nonmovant shows by affidavit or declaration that, for specified
reasons, it cannot present facts essential to justify its
opposition, the court may . . . (1) defer considering the motion
or deny it; (2) allow time to obtain affidavits or declarations
or to take discovery; or (3) issue any other appropriate
order").  Courts interpreting this rule have consistently held
that a nonmovant must provide "a reasonable basis to suggest
that [the requested] discovery would reveal triable issues of
fact" in order for such a request to be granted.  *McWay v.
LaHood*, 269 F.R.D. 35, 38 (D.D.C. 2010); *see also Richard v.
Leavitt*, 235 Fed.Appx 167, 167 (4th Cir. 2007) (affirming
district court's denial of a Rule 56(d) request when the
plaintiff failed to provide a basis for believing that the
information sought actually existed); *Price ex rel. Price v.
Western Resources, Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)
(reasoning that the Rule 56(d) affidavit must "identify[] the

## III. Defendants' Motion for Summary Judgment

### A.    Standard of Review

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).   Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).   "A mere scintilla of

probable facts not available and what steps have been taken to obtain these facts"); *Wright v. Eastman Kodak Co.*, 550 F.Supp.2d 371, 382 (W.D.N.Y. 2008) ("While a Rule 56[(d)] discovery request may be granted to allow a plaintiff to 'fill material evidentiary gaps,' it may not be premised solely on speculation as to evidence which *might* be discovered: 'it does not permit a plaintiff to engage in a fishing expedition.'" (emphasis in original)).   Plaintiff has provided no affidavit or declaration, nor has she otherwise made any showing regarding what additional discovery might reveal.   Thus, a request for discovery or denial of the motion for summary judgment pursuant to Rule 56(d) would also be denied.

proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).   At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion.   *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

   **B.   Sexual Harassment**

   While Plaintiff's complaint is far from a model of clarity, it appears to raise a claim of sexual harassment against one or more defendants in violation of Title VII related to the conduct of Ebelein.   *See Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) ("Sexual harassment creating a hostile or abusive atmosphere in the workplace gives rise to a claim of sex discrimination under Title VII") (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986)).[17]   Defendants contend that any

_____

[17] The second count of the complaint asserts a claim against Payless for violation of § 1981 based on the allegations contained in the first count for violations of Title VII.   To the extent Plaintiff intended to allege sexual harassment under § 1981 against any defendant, such a claim is not cognizable. *See Anjelino v. New York Times Co.*, 200 F.3d 73, 98 (3rd Cir. 1999) ("Because the statute, on its face, is limited to issues of racial discrimination in the making and enforcing of contracts, courts have concluded that sex-based claims are not cognizable under 42 U.S.C. § 1981."); *Carter v. Morris*, 36 F.3d 1091, 1994 WL 532866, at *2 n. 2 (4th Cir. 1994) (Table) ("Sexual harassment . . . is not cognizable under § 1981").

claim of sexual harassment is barred due to Plaintiff's failure to raise it in her EEO charge.

It is well-established that "[b]efore filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). The scope of the civil action stemming from the EEOC charge is confined to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation [of that complaint]." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quotation marks omitted). Civil suits may not present entirely new factual bases or entirely new theories of liability not found in the initial EEOC complaint. Therefore, a plaintiff fails to exhaust her claims when "h[er] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in h[er] formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).

Plaintiff's EEO charge alleged disparate treatment based on race, national origin, and gender.[18] She specifically referenced "unfair treatment" and "negative statements made regarding her

---

[18] Aside from her sexual harassment claim, Plaintiff does not allege gender discrimination before this court.

accent," "verbal abuse," that she was "forced to work when injured," and that she was disparately treated in terms of compensation (ECF No. 43-2, at 60), but made no mention of sexual misconduct or harassment. Because Plaintiff failed to raise her sexual harassment claim in the EEO charge, and that claim is not reasonably related to the grounds she did cite, she is barred from raising them in the instant action. *See, e.g., Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) (finding allegations of sexual harassment in the complaint were not "reasonably related" to EEOC charge's allegations of discrimination based on gender).

Even if the court were to reach the merits of this claim, it could not survive a motion for summary judgment. To establish a claim for sexual harassment, a plaintiff must "prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). Here, because Ebelein was not Plaintiff's supervisor, Payless could only be liable for his misconduct if it "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree*, 335 F.3d at 334 (internal marks omitted). Payless maintained an anti-harassment policy, as well

as the "AlertLine" service – which allowed employees to report workplace misconduct anonymously – and Plaintiff was made aware of the policy and hotline on at least two different occasions. Moreover, as a store manager responsible for hiring, training, and supervision of staff, she should have been very familiar with Payless protocol in this regard.   Nevertheless, the record reflects that she made no report of Ebelein's conduct to anyone. While it may be the case that she feared retaliation if she did so, "an employee's fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Thomas v. BET Soundstage Restaurant*, 104 F.Supp.2d 558, 568 (D.Md. 2000) (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)).   Absent any evidence that Plaintiff told anyone about the alleged misconduct, or that anyone else witnessed it, there is simply no basis for imputing liability to Payless.[19]

**C.   Race and National Origin Discrimination**

Plaintiff further contends that Payless terminated her employment on the basis of race and/or national origin.   A plaintiff may establish a claim for intentional discrimination

---

[19] It is well-established, moreover, that individuals cannot be liable under Title VII.   *See Lissau v. Southern Food Servs., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998).   Thus, Plaintiff's Title VII claims against Ebelein and/or DiMicco, individually, cannot be sustained.

using two methods.[20]   She may either demonstrate "through direct or circumstantial evidence" that her race or national origin "motivated the employer's adverse employment decision," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), or she may "proceed under a 'pretext' framework" – commonly referred to as the *McDonnell Douglas* approach – "under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination," *id.* at 285.

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal marks omitted). "Only the most blatant remarks, [the intent of which] could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Signal v. Gonzales*, 430

_____

[20]   Section 1981 and FEPA claims of discrimination are analyzed under the same framework as Title VII.   *See Wise v. Gallagher Basset Servs., Inc.*, 228 F.Supp.2d 671, 674 (D.Md. 2002 (FEPA); *Dang v. Inn at Foggy Bottom*, 85 F.Supp.2d 39, 41 (D.D.C. 2000) (§ 1981)).   "Because section 1981 extends only to claims of racial discrimination, a claim . . . based solely on nation of origin may not be brought under this provision." *Dang*, 85 F.Supp.2d at 41 n. 1.   Racial discrimination in this context, however, "is construed broadly to include claims of discrimination based on national 'ancestry or ethnic characteristics,' i.e. the identifiable racial or ethnic characteristics associated with a particular national origin, but not to a claim based on national origin itself." *Id.*

F.Supp.2d 528, 541 n. 5 (D.S.C. 2006) (internal bracket omitted) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).  If believed, direct evidence "would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (internal marks omitted), *rev'd on other grounds*, 517 U.S. 308 (1996).  To defeat a motion for summary judgment, the evidence must show that the employer announced, admitted, or "otherwise unmistakably indicated" that an impermissible consideration was a determining factor, or that discrimination can properly be assumed from the circumstances.  *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982).

Plaintiff has presented no direct evidence that her employment was terminated based on her race.  In fact, the only mention of race in the entire record comes from Kathy Rhule, who allegedly told Plaintiff after her report of the March 31 incident with DeMicco that "she hoped this was not a racial case."  (ECF No. 2 ¶ 27).[21]  With respect to national origin, Plaintiff asserts that, on at least two occasions, DeMicco imitated her accent and once stated, "I don't like your accent." (*Id*. at ¶ 35).  These comments may constitute evidence of a discriminatory attitude on the part of DeMicco, but they were

---

[21]  Rhule later advised Plaintiff, after further investigation, that "she did not think this was a racial case[.]"  (ECF No. 2 ¶ 29).

not in any way linked to Plaintiff's termination.  *See Betof v. Suburban Hospital*, Civ. No. DKC 11-1452, 2012 WL 2564781, at *6 (D.Md. June 29, 2012) ("To constitute direct evidence, statements must be directly related to the employment decision in question") (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).  Indeed, they allegedly were made approximately two months prior to Plaintiff's termination date and in a context unrelated to Plaintiff's employment status.  *See O'Connor*, 56 F.3d at 549 (statement made two days prior to the plaintiff's termination that the company needed to "get some young blood" did "not evince an intent to discharge an older employee"); *Paris v. ARC/Davidson County, Inc.*, 307 F.Supp.2d 743, 754-55 (M.D.N.C. 2004) (statement about a company "not employ[ing] enough black people" did not constitute direct evidence because, among other reasons, there was no indication that it was "more than just [a] stray or isolated remark"); *Candillo v. N.C. Dep't of Corr.*, 199 F.Supp.2d 342, 350 (D.Md. 2002) (derogatory comments made about Hispanics was not direct evidence where the comments occurred in response to the plaintiff's request for secretarial support, "not the decision whether to promote" the plaintiff).

Absent direct evidence, Plaintiff must prove her case circumstantially using the pretext framework established in

*McDonnell Douglas*.   Under this framework, Plaintiff must first demonstrate a *prima facie* case of discriminatory discharge, which requires Plaintiff to show that:  (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) her position was filled by a similarly qualified applicant outside the protected class.  *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Defendants argue that Plaintiff cannot meet the third prong of the *prima facie* showing because she cannot establish that she was meeting Payless' legitimate expectations at the time she was terminated.   They assert that her "insubordinate, confrontational and hostile" behavior during the meeting with DeMicco on March 31, "combined with her refusal to follow the 6/54 Policy, constituted a clear violation of Payless' Code of Conduct" and was the basis for her termination.  (ECF No. 43-1, at 24).  The relevant time period for evaluating the adequacy of the employee's job performance, however, is clearly not immediately after the event that prompted termination.   *See Bradford v. Conbraco Indus., Inc.*, Civ. No. 4:08-cv-2085-RBH-TER, 2010 WL 1069543, at *8 (D.S.C. Feb. 12, 2010) ("the relevant time period to assess Plaintiff's job performance is from January 2007, when she began her position as calibration

lab clerk, to April 2007, when she was terminated from that position"). The record reflects that Plaintiff consistently received strong performance evaluations over the course of her employment and that she earned a number of performance-based awards. Thus, Plaintiff has established that her job performance was meeting her employer's legitimate expectations. *See Boyd v. Presbyterian Hosp.*, 160 F.Supp.2d 522, 535 (S.D.N.Y. 2001) ("The second prong of a prima facie case, satisfactory job performance, is a fairly low threshold to meet").

Defendants further contend that Plaintiff cannot meet the fourth prong of the *prima facie* showing because she cannot "demonstrate that other employees outside of her protected class were treated differently" insofar as she acknowledged at her deposition that "all [s]tore [m]anagers . . . were required to comply with the 6/54 [p]olicy for the pre-Easter period [from] March 29 – April 11, 2009." (ECF No. 43-1, at 25). The relevant question, however, is not whether all similarly-situated employees were subject to the same requirements in terms of work hours, but whether Plaintiff's position was filled by someone outside her protected classes. There appears to be no dispute that, upon Plaintiff's termination, Payless installed Kevin Campbell, a Caucasian male, as the store manager at the Bowie location. Accordingly, Plaintiff has established a *prima facie* case of discrimination based on race and national origin.

The burden, then, shifts to Defendants to assert a legitimate, nondiscriminatory reason for Plaintiff's termination.  Defendants have offered extensive evidence that Plaintiff's termination resulted from her inappropriate behavior during the counseling meeting with DeMicco on March 31.  This evidence reflects that DeMicco and Snell initially decided to issue Plaintiff "a Final Written Warning in Lieu of Termination . . . for insubordination based upon her refusal to comply with the 6/54 Policy."  (ECF No. 43-2, at 44; *see also id.* at 5).  This warning specifically advised that "[a]ny other incidents viewed as insubordinate will result in immediate termination." (*Id.* at 52).  When DeMicco attempted to discuss the written warning with Plaintiff, she began "shouting" at him, "throwing her personal belongings around the backroom," and "follow[ed] [him] through the sales floor[,] . . . continuing to shout . . . in front of customers and associates[.]"  (*Id.* at 11).  If believed, this conduct would constitute a clear violation of Payless' Code of Conduct, and, by itself, could have "result[ed] in immediate termination without prior disciplinary warning." (*Id.* at 6).  According to Defendants, it was only after Plaintiff's outburst that DeMicco and Snell consulted and the decision to discharge was made.  Based on this evidence, Defendants have provided a legitimate, non-discriminatory reason for Plaintiff's dismissal.  *See Armstrong v. Index Journal Co.,*

647 F.2d 441, 448 (4th Cir. 1981) (Title VII "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.  An employer must retain power to discipline and discharge disobedient employees").

Plaintiff, therefore, bears the burden of showing that Defendants' proffered justification was pretext for discrimination.  Although she has not submitted any evidence in response to Defendant's motion, the purportedly verified complaint provides a very different account of what transpired on March 31.  According to Plaintiff, it was DeMicco who acted inappropriately when he "yelled at her" as she entered the store's stockroom, "slammed his material[s] on a nearby table," physically accosted her when she attempted to report his conduct to Rhule, "yelled that she was suspended and should 'get out,'" and "banged on [her] car demanding the keys [to the store]" when she tried to leave.  (ECF No. 2 ¶¶ 24, 25).  Plaintiff further asserts that, in the midst of these events, she asked DeMicco if he was planning on replacing her with Campbell, to which DeMicco replied that he would do as he pleased and "plac[ed] a telephone call to [Campbell]." (*Id*. at ¶ 24).  Moreover, she asserts that her employment was not terminated on March 31, as Defendants suggest, but that DeMicco told her she was discharged during a phone conversation on the evening of April 2.  Indeed, Defendants themselves have provided evidence supporting that

34

discharge date. (ECF No. 43-2, at 18). During the interim between March 31 and the evening of April 2, a number of potentially significant events occurred, including a conversation between Plaintiff and Rhule, during which Rhule allegedly said that "she hoped this was not a racial case" (ECF No. 2 ¶ 27), and Plaintiff's provision of a "disability certificate" from Dr. Chung reflecting that she was "partially incapacitated" during the critical time period and "need[ed] to work only 45 hours due to injury" (ECF No. 43-2, at 57).

In sum, the record reveals numerous disputes of material fact about the circumstances of Plaintiff's termination. Accordingly, Payless' motion for summary judgment on Plaintiff's discriminatory discharge claims will be denied.

### D. Retaliation

Plaintiff's claims of retaliation under Title VII, § 1981, and FEPA are also analyzed under the *McDonnell Douglas* framework. To establish a *prima facie* case, she must show that: (1) she engaged in a protected activity, (2) her employer acted adversely against her, and (3) the protected activity was causally connected to the adverse action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (Title VII); *Pulley v. KPMG Consulting, Inc.*, 348 F.Supp.2d 388, 396 (D.Md. 2004) (§ 1981). Defendants argue that Plaintiff cannot show that she engaged in a protected activity.

Pursuant to 42 U.S.C. § 2000e-3(a), it is unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Protected activity of an employee, therefore, can take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause).

Plaintiff asserts that her termination "constituted retaliation against Plaintiff for inquiring about, and objecting to, [DeMicco's] plans unlawfully to replace her as the Store Manager." (ECF No. 2 ¶ 54). Indeed, the complaint reflects that, on multiple occasions, Plaintiff expressed to DeMicco her concern that he was planning to install Campbell as store manager – a fear that ultimately came to fruition after Plaintiff was terminated. DeMicco denied ever having such a plan (ECF No. 43-2 ¶ 11), however, and Plaintiff never expressed her concern to the human resources department (*id*. at 44). Thus, Plaintiff's alleged protected activity consists of voicing her opposition to what she perceived to be a plan to discriminate against her to the would-be discriminator. To be

entitled to protection under the opposition clause, she must have opposed "an unlawful employment *practice*" under Title VII. 42 U.S.C. § 2000e-3(a) (emphasis added); *see also Dea v. Washington Suburban Sanitary Comm'n*, 11 Fed.Appx. 352, 357-58 (4th Cir. 2001) ("At a minimum . . . a plaintiff bringing a claim for retaliation must have held a reasonable, good faith belief that the employment practice [she] opposed was violative of Title VII."). Plaintiff does not assert that she opposed any practice; rather, she claims that she opposed what she perceived to be a plan to violate Title VII in the future. This does not constitute a protected activity under the opposition clause. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

### E.   Negligent Supervision and Retention

In the seventh count of her complaint, labeled "State Wrongful Conduct," Plaintiff alleges negligent supervision and retention against Payless based on Ebelein's sexually inappropriate conduct and the alleged battery committed by DeMicco on March 31. Defendants argue that Plaintiff "has not alleged, must less proven, the requisite elements" of her claim. (ECF No. 46, at 9).

As Judge Davis explained in *Bryant v. Better Business Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 751 (D.Md. 1996):

In order to prove a cause of action for either negligent hiring, supervision or retention, the Plaintiff must establish that her injury was caused by the tortious conduct of a coworker, that the employer knew or should have known by the exercise of diligence and reasonable care that the coworker was capable of inflicting harm of some type, that the employer failed to use proper care in selecting, supervising or retaining that employee, and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries. *See Evans* [*v. Morsell*, 284 Md. 160, 165 (1978)] (quoting [*Norfolk and Western R.R. Co. v. Hoover*, 79 Md. 253, 262 (1894)]; *see also McCall's Ferry Power Co. v. Price*, 108 Md. 96, 69 A. 832, 834 (1908).

Here, there is no evidence in the record that Plaintiff reported DeMicco's alleged battery on March 31 or Ebelein's sexually inappropriate conduct to anyone associated with Payless or that there were any witnesses to these incidents. There is, moreover, nothing suggesting that similar conduct on the part of the offending co-workers had occurred in the past such that Payless either knew or should have known of the propensity for tortious conduct. Thus, assuming Plaintiff suffered an injury, she cannot show that it was proximately caused by Payless. *See Bryant*, 923 F.Supp. at 752 ("negligence is actionable only if it is a proximate cause of damage") (quoting *Cramer* [*v. Housing Opportunities Comm'n of Montgomery County*, 304 Md. 705, 713 (1985)]). Accordingly, Defendants are entitled to summary judgment on this claim.

## IV.  Conclusion

For the foregoing reasons, Plaintiff's motion for reconsideration will be denied and Defendants' motion for summary judgment will be granted in part and denied in part.  A separate order will follow.


                              _____/s/_____
                              DEBORAH K. CHASANOW
                              United States District Judge